# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

## CIVIL ACTION NO. <u>1:17-cv-113</u>

| | | |
|---|---|---|
| JUSTIN BEAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| NORTH CAROLINA DEPARTMENT | ) | |
| OF HEALTH AND HUMAN SERVICES, | ) | |
| DIVISION OF STATE OPERATED | ) | |
| HEALTHCARE FACILITIES, | ) | |
| BLACK MOUNTAIN NEURO- | ) | |
| MEDICAL TREATMENT CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES Plaintiff Justin Beal, requesting a jury trial, and alleges the following against Defendant:

## INTRODUCTION

1.     This is a civil action brought to recover damages and equitable relief from Defendant North Carolina Department of Health and Human Services, Division of State Operated Healthcare Facilities, Black Mountain Neuro-Medical Treatment Center, on account of Defendant's unlawful intentional discrimination and retaliation against Plaintiff Justin Beal in violation of the Americans With Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12101 *et seq*.

## JURISDICTION

2.     The court has jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1343.  The federal claims in this lawsuit are authorized and instituted pursuant

to § 107(a) of the ADA, 42 U.S.C. § 1211(7)(a).

3. On or about July 29, 2015, Plaintiff Justin Beal timely filed a Charge of Discrimination against Defendant with both the North Carolina Office of Administrative Hearings, Civil Rights Division ("OAH") and the Equal Employment Opportunity Commission ("EEOC"), designated as EEOC Charge No. 430-2015-01844, complaining of disability discrimination and retaliation in violation of the ADA and Chapter 126 of the North Carolina General Statutes.

4. The EEOC referred the Charge of Discrimination to the OAH.

5. On or about April 15, 2016, Plaintiff Justin Beal filed an Amended Charge of Discrimination against Defendant with the OAH, designated as FEPA Charge No. 16-CRD-1844, to include Chapter 7A-759(b1) of the North Carolina General Statutes.

6. On or about November 8, 2016, the OAH issued its determination in this matter.

7. On or about January 24, 2017, the EEOC issued a Notice of Right to Sue to Plaintiff Justin Beal.

8. This action is filed within ninety days of January 24, 2017.

9. Plaintiff has exhausted all his administrative remedies.

10. Plaintiff worked as a Health Care Technician I (HCT I) for Defendant from July 10, 2013 through February 4, 2015.

11. In his position, Plaintiff was subject to the provisions of Chapter 126 of the North Carolina General Statutes, the North Carolina Human Resources Act, and Plaintiff was not in an exempt policy-making position.

12. Defendant waived its sovereign immunity to Plaintiff's lawsuit under the

ADA as set forth in N.C. Gen. Stat. § 143-300.35.

## VENUE

13.     Plaintiff Justin Beal resides in McDowell County, North Carolina.

14.     Defendant North Carolina Department of Health and Human Services, Division of State Operated Healthcare Facilities, Black Mountain Neuro-Medical Treatment Center, resides or maintains offices in Buncombe County, North Carolina.

15.     A substantial part of the events giving rise to this action occurred in Buncombe County, North Carolina.

16.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Western District of North Carolina.

17.     The Asheville Division is the proper division for this case in the United States District Court for the Western District of North Carolina.

## PARTIES

18.     Plaintiff Justin Beal ("Beal") is a citizen and resident of Marion, McDowell County, North Carolina.

19.     North Carolina Department of Health and Human Services ("DHHS") is an agency of the State of North Carolina, organized pursuant to N.C. Gen. Stat. § 96-3, and has headquarters in Raleigh, Wake County, North Carolina.

20.     North Carolina Division of State Operated Healthcare Facilities ("DSOHF") is a division of DHHS that oversees and manages fourteen state operated healthcare facilities that treat adults and children with mental illness, developmental disabilities, and substance abuse disorders.

21.     Black Mountain Neuro-Medical Treatment Center ("BMNTC") is a

3

specialized skilled nursing facility that operates under the auspices of DHHS, DSOHF.

22.     At all times relevant to this complaint, Beal was an "employee" of Defendant North Carolina Department of Health and Human Services, Division of State Operated Healthcare Facilities, Black Mountain Neuro-Medical Treatment Center ("Defendant") within the meaning of § 101 of the ADAAA, 42 U.S.C. § 12111.

23.     Defendant is an "employer" within the meaning of § 101 of the ADAAA, 42 U.S.C. § 12111.

24.     Defendant has employed five-hundred or more employees for each working day during each of twenty or more calendar weeks in the current or preceding calendar year.

25.     At all times relevant to this Complaint, Defendant employed the following people, who acted as its officers, managers, supervisors, and/or agents and acted within the course and scope of their employment and responsibilities as officers, managers, supervisors, and/or agents with respect to the acts complained of in this Complaint:

    a.      Sharon Shelton - Health Care Supervisor I

    b.      Denise Vess - Health Care Supervisor I

    c.      Jamie Gomez - Health Care Supervisor I

    d.      Kathy Griffith - Unit Manager

    e.      Belinda Croft - Unit Manager

    f.      Betty Dotson - Benefits Specialist

    g.      Nori Stone - Employee Relations Specialist

**STATEMENT OF FACTS**

26.     Plaintiff Justin Beal ("Beal") is a resident of Marion, McDowell County,

4

North Carolina.

27.     In 2012, Beal began having panic attacks.

28.     Beal was diagnosed with panic anxiety syndrome and panic disorder.

29.     Beal was placed on prescription medication, Klonopin and Fluoxetine, for his panic disorder.

30.     Beal's panic disorder was very well maintained on a low dose of prescription medication in 2012 and 2013.

31.     Beal is substantially limited in one or more of his major life activities and major bodily functions, including, but not limited to, thinking, concentrating, interacting with others, and communicating.

32.     Beal became a CNA I in December 2012.

33.     On or about July 10, 2013, Beal was hired by Defendant.

34.     Beal's job class title was Health Care Technician I (HCT I).

35.     Beal's working class title was Certified Nursing Assistant I (CNA I).

36.     Beal was hired to work at the Black Mountain Neuro-Medical Treatment Center ("BMNTC"), located in Black Mountain, Buncombe County, North Carolina.

37.     BMNTC provides Medicaid certified 24/7 nursing home services (comprehensive long term care) to developmentally disabled persons and persons with Alzheimer's disease and dementia.

38.     BMNTC has five residential units: three developmental disability units, and two specialized dementia units.

39.     Beal was hired to work a second shift position, with the Cedar Springs/Gravely 3 ("G3") Unit.

40.     The G3 Unit is a specialized dementia unit that serves individuals with Alzheimer's disease and dementia who have had aggressive behaviors.

41.     During Beal's employment on the second shift with the G3 Unit, he reported directly to Health Care Supervisor I (HCS I) Sharon Shelton ("Supervisor Shelton"), who in turn reported to Unit Manager Kathy Griffith ("Unit Manager Griffith").

42.     Beal's job duties involved providing basic CNA care for residents, including but not limited to providing assistance with activities of daily living (toileting, changing, dressing, bathing, grooming, serving meals and snacks); providing individual medical care (performing treatments, obtaining vital signs, assisting with medical procedures); collecting data relevant to care; and maintaining documentation.

43.     Beal was a good employee whose work performance was at all times satisfactory.

44.     Beal met expectations and received praise from his supervisors while employed by Defendant.

45.     Beal received satisfactory performance evaluations, with performance ratings of meets all expectations.

46.     Beal's supervisors and co-workers on the G3 Unit were aware that he had panic attacks, which he was able to control by taking medication.

47.     Beal informed his supervisors and co-workers on the G3 Unit that he had panic attacks, which he was able to control by taking medication.

48.     During Beal's employment with Defendant on the G3 Unit, he had panic attacks while at work, which he was able to control by taking medication.

49.     When Beal had panic attacks while at work, he frequently advised his supervisors and co-workers on the G3 Unit that he was having a panic attack, and that he needed to take a short break to take his medication.

50.     Defendant accommodated Beal's need to take short breaks to take his medication during a panic attack.

51.     Beal's supervisors and co-workers would cover his job duties when he needed to take short breaks to take his medication during a panic attack.

52.     On or about May 1, 2014, Beal transferred from the second shift to the third shift on the G3 Unit.

53.     During Beal's employment on the third shift with the G3 Unit, he reported directly to Health Care Supervisor I (HCS I) Jamie Gomez ("Supervisor Gomez"), who in turn reported to Unit Manager Griffith.

54.     After Beal's transfer to third shift, he developed more frequent and more severe panic attacks.

55.     Beal informed Supervisor Gomez, Supervisor Shelton, and Unit Manager Griffith that his panic symptoms increased on the third shift and requested to transfer back to the second shift.

56.     Beal's supervisors agreed to transfer him back to the second shift, but advised him that he would have to wait for two weeks to apply for the second shift position.

57.     On May 9, 2014, Beal sought medical treatment from his primary care provider at Table Rock Family Medicine, Dr. Clay Richardson ("Dr. Richardson").

58.     On May 9, 2014, Dr. Richardson wrote a note for Beal to provide to

Defendant, which stated, in pertinent part: "Jason is a 36 year old male patient of mine and employee of yours with well documented panic disorder. He was under excellent controll [sic] until he elected to change from 2nd shift to 3rd shift May 1st. Since then he has had a marked increase in his panic symptoms. I am recommending a medical leave of absence until he can be put back on second shift."

59. Beal provided his supervisor(s) with Dr. Richardson's work note.

60. Defendant accommodated Beal's request to transfer back to second shift.

61. On or about May 19, 2014, Beal transferred from the third shift to the second shift on the G3 Unit.

62. After Beal's transfer to second shift, his panic attacks improved to their former frequency and severity.

63. On or about June 24, 2014, Beal was physically attacked by a patient with Alzheimer's disease and suffered a left shoulder injury.

64. Beal filed a workers' compensation claim for his left shoulder injury, received medical treatment, and was placed on light duty work restrictions.

65. Defendant accommodated Beal's light duty work restrictions.

66. While Beal was on light duty work restrictions, he was assigned to work as a hall monitor.

67. Beal was referred to an orthopedic surgeon for his workers' compensation injury.

68. Beal was then referred to physical therapy for his workers' compensation injury.

69. On or about Tuesday, August 26, 2014, Beal was physically attacked by a

8

patient with a mental health disorder ("Patient X") after Beal intervened to stop him from

hitting another patient.

70.    Unit Manager Griffith attempted to assist Beal because he was on light

duty work restrictions, but Patient X pushed Unit Manager Griffith into plexiglass.

71.    Patient X then grabbed Beal by the throat and began choking him.

72.    The attack was witnessed by many of Beal's female co-workers who did

not provide assistance.

73.    Beal finally struggled away from Patient X and was able to hold him while

Beal's co-worker gave him a shot.

74.    Several other male employees then came in from other units to restrain

Patient X.

75.    While Patient X was restrained, Beal's co-workers gave him two

additional shots.

76.    On or about Wednesday, August 27, 2014, Patient X was walking in the

hallway, pretending that he had a machine gun.

77.    The nurses on duty instructed Beal and his co-workers to take Patient X to

his room before he had another violent episode.

78.    While Beal and his co-workers were taking Patient X his room, he became

extremely violent and began yelling, "I'm going to fucking kill you."

79.    On or about Thursday, August 28, 2014, Patient X was walking up and

down the hallway, turning around, pacing, clinching his fists, opening and shutting doors,

spinning around in circles, and making strange noises.

80.    Patient X had previously engaging in similar behavior shortly before he

attacked Beal on August 26, 2014.

81.     Around 5:30 p.m., Beal began having a panic attack, and he took a short break to take his medication.

82.     Beal's medication did not relieve his panic symptoms and his panic attack worsened.

83.     This was the first occasion that Beal was unable to control a panic attack with medication while at work.

84.     Beal informed Supervisor Shelton that he was having a panic attack and that he needed to go home.

85.     Supervisor Shelton agreed to let Beal leave work early because of his panic attack.

86.     Beal missed 5.25 hours of work on August 28, 2014, because of his panic disorder.

87.     Due to the physical assault by Patient X that Beal suffered while working for Defendant, he began having panic attacks that his medication could not control.

88.     Beal was unable to work on Friday, August 29, 2014 because of his panic disorder.

89.     Beal notified Supervisor Shelton that he could not work on Friday, August 29, 2014 because he was still having panic attacks.

90.     Beal sought medical treatment from his health care provider at Table Rock Family Medicine, Michael Stephanides, PA ("PA Stephanides"), and obtained an out-of-work note that excused him from work on August 29, 2014.

91.     Beal was unable to attend his physical therapy appointment for his

workers' compensation injury on August 29, 2014 because of his panic disorder.

92.     Beal was not scheduled to work on August 30, August 31, or September 1, 2014.

93.     Beal was unable to return to work on Tuesday, September 2, 2014, because of his panic disorder.

94.     On September 2, 2014, Beal called PA Stephanides, who instructed him to stay out of work and schedule a follow up appointment.

95.     Beal scheduled a follow-up appointment with PA Stephanides on September 5, 2014.

96.     On September 2, 2014, Beal notified Supervisor Shelton that he could not work because he was still having panic attacks, and that he would be out of work until he followed up with his health care provider on September 5, 2014.

97.     On September 2, 2014, Defendant gave Beal a FMLA medical certification form to complete.

98.     On September 2, 2014, Beal provided the FMLA medical certification form to his health care provider.

99.     Beal was unable to attend his orthopedic surgeon appointment for his workers' compensation injury on September 3, 2014 because of his panic disorder.

100.     On September 5, 2014, Beal had a follow up appointment with PA Stephanides.  Beal obtained an out-of-work note that excused him from work until September 15, 2014.

101.     On or about September 5, 2014, Beal's health care provider completed the FMLA medical certification form and faxed it to Defendant.  The FMLA medical

11

certification form requested leave for panic disorder and estimated approximately 2 weeks of leave.

102.    By letter dated September 11, 2014, Defendant notified Beal that his request for FMLA leave was officially approved retroactively beginning August 29, 2014, that his expected return to work date was undetermined, and that he was entitled to 12 weeks (480 hours) of FMLA leave.

103.    On September 22, 2014, Beal had a follow up appointment with Dr. Richardson. Beal obtained an out-of-work note that excused him from work from September 15, 2014 through October 6, 2014.

104.    Beal provided Defendant with a copy of the September 22, 2014 out-of-work note.

105.    On or about October 7, 2014, Beal returned to work.

106.    Beal continued to work on the G3 Unit, but Unit Manager Griffith instructed him to stay away from Patient X because of Beal's panic disorder.

107.    Beal attempted to stay away from Patient X, but he could not avoid Patient X because he was assigned as a hall monitor.

108.    Beal continued to have more frequent and more severe panic attacks after his return to work.

109.    Beal's supervisors and co-workers on the G3 Unit were aware that Beal continued to have more frequent and more severe panic attacks after his return to work.

110.    Beal told Supervisor Shelton that he wanted to transfer to another unit so that he could avoid Patient X and reduce his panic attacks.

111.    Beal requested a transfer to another unit as an accommodation to his panic

disorder.

112.    Supervisor Shelton advised Beal that he would need to apply for an open position.

113.    On or about October 13, 2013, Supervisor Shelton placed Beal on a performance improvement plan (PIP) for "Unacceptable personal conduct- for the willful violation of known/written work rules/policies."

114.    The PIP stated that Beal violated BMNTC's Attendance Policy PRO 401, which states: "It is the standard that employees miss no more than a day and a half (12 hours for staff who work an 8 hour shift or 15 hours for staff who work a 10 hour shift) of unscheduled absence each month."

115.    The PIP stated that a time review of August 2014 indicated that he incurred a total of 13.25 hours of unscheduled absence: (1) 8 hours on 8/20/14 due to child's illness, and (2) 5.25 hours on 8/28/14 due to absence not covered by FML.

116.    The PIP also stated that Beal violated BMNTC's Workers' Compensation Policy PER 850, which states: "8. . . . the employee shall promptly inform WCA/HR, his/her supervisor and the Third Party Administrator of any change in condition. 9. "[t]he Employee is required to keep medical appointments."

117.    The PIP stated that Beal was noncompliant by failing to advise BMNTC and the workers' compensation administrator of any change in condition, and failing to attend medical appointments related to his workers' compensation injury.

118.    Defendant placed Beal on a PIP because leaving work early on August 28, 2014 because of his panic attack caused him to exceed the allotted 12 hours of unscheduled absences per month in August 2014 by 1.25 hours.

119. Defendant placed Beal on the PIP because during his FMLA leave, he was unable to attend medical appointments for his workers' compensation injury because of his panic disorder.

120. Beal applied to transfer to an HCT I position in the Raspberry 1 ("R1") Unit.

121. The R1 Unit is a developmentally disabled unit that serves individuals with severe developmental disabilities.

122. At the time Beal applied to transfer to the R1 Unit, all of the individuals on the R1 Unit were in wheelchairs, with the exception of one individual who was ambulatory.

123. The individuals in the R1 Unit were generally less combative than individuals in the G3 Unit.

124. After Beal applied to transfer to the R1 Unit, he told Supervisor Shelton that he had applied for an HCT I position in the R1 Unit and that he wanted to transfer.

125. Supervisor Shelton advised Beal that he could not transfer because of the PIP.

126. Supervisor Shelton also told Beal that she wanted him to stay in the G3 Unit and that she needed a man in the G3 Unit.

127. The Health Care Supervisor I (HCS I) in the R1 Unit, Anthony Robbs ("Supervisor Robbs"), initially wanted to hire Beal for the HCT I position in the R1 Unit.

128. When Supervisor Robbs asked Supervisor Shelton about Beal, she told him, "You don't want my problem."

129. Beal was not hired for the HCT I position in the R1 Unit because

14

Supervisor Shelton told Supervisor Robbs that he was a "problem."

130.    Beal applied to transfer to an HCT I position in the Raspberry 2 ("R2") Unit.

131.    The R2 Unit is a developmentally disabled unit that serves individuals with developmental disabilities, many of whom were in wheelchairs.

132.    The individuals in the R2 Unit were generally less combative than individuals in the G3 Unit.

133.    On or about November 19, 2013, Beal was hired and transferred to a second shift position with the R2 Unit.

134.    During Beal's employment on the second shift with the R2 Unit, he reported directly to Health Care Supervisor I (HCS I) Denise Vess ("Supervisor Vess"), who in turn reported to Unit Manager Belinda Croft ("Unit Manager Croft").

135.    On or about Saturday, December 20, 2014, Beal was in the process of changing a patient when another patient with a history of hitting people ("Patient Y") hit him in the head from behind.

136.    Beal began having a panic attack, which he could not control with medication.

137.    Beal informed Supervisor Vess that he was having a panic attack and that he needed to go home.

138.    Supervisor Vess told Beal that he could take a break on the couch in the break room.

139.    Supervisor Vess then left work, without agreeing to let Beal leave work early because of his panic attack as he requested.

140.    Beal had to continue working on December 20, 2014, while having a panic attack.

141.    On Sunday, December 21, 2014, Beal was unable to work because of his panic disorder.

142.    Beal notified Defendant that he could not work on December 21, 2014 because he was still having panic attacks.

143.    Beal did come to BMNTC's office on December 21, 2014, and sign a medical release form authorizing BMNTC to communicate directly with his health care providers to determine his ability to perform the essential functions of his job and any medical limitations he may have upon his return to work.

144.    On Monday, December 22, 2014, Beal was unable to work because of his panic disorder.

145.    On Monday, December 22, 2014, Beal sought medical treatment from PA Stephanides, who prescribed additional medication for Beal's panic disorder. Beal obtained an out-of-work note that excused him from work on December 22, 2014.

146.    Beal notified Defendant that he could not work because he was still having panic attacks, and that he would be out of work from December 22, 2014 until he was able to follow up with his health care provider.

147.    On Friday, December 26, 2014, Beal had a follow up appointment with a health care provider at Table Rock Family Medicine, Dr. Scott Chris Scoggins ("Dr. Scoggins").

148.    Beal obtained a completed FMLA medical certification form from Dr. Scoggins dated December 26, 2014.   The FMLA medical certification form requested

leave for panic disorder and estimated that Beal would need leave until January 12, 2014.

149.    Beal provided Defendant with the FMLA medical certification form and requested leave under the FMLA for his panic disorder.

150.    On or about January 2, 2015, Beal had a follow up appointment with his regular health care provider, Dr. Richardson.  Beal obtained an out-of-work note that excused him from work from January 2, 2015 through January 26, 2015.

151.    Beal provided Benefits Specialist Betty Dotson ("Specialist Dotson") with a copy of his out-of-work note dated January 2, 2015.

152.    Beal also asked Specialist Dotson to provide him with paperwork to apply for short term disability (STD).

153.    When Beal requested the STD paperwork, Specialist Dotson replied, "Is it going to go out that far?"

154.    Beal responded that he received the STD paperwork for his previous FMLA leave, which was for a shorter period of time, and that he needed the STD paperwork in case he needed to apply.

155.    When Beal was leaving the office, he overheard Employee Relations Specialist Nori Stone ("Specialist Stone") tell another employee in Human Resources, "We need to nip this in the bud."

156.    Beal believed that Specialist Stone was referring to him, and in particular, his panic disorder and medical leave.

157.    In January 2015, Unit Manager Croft called Beal.

158.    During this telephone conversation, Unit Manager Croft asked Beal when he would be able to return to work, and Beal responded that he did not know.

17

159. During this telephone conversation, Beal told Unity Manager Croft that he did not want to lose his job.

160. By letter dated January 12, 2015, Defendant notified Beal that his request for FMLA leave was officially approved retroactively beginning December 21, 2014, with his expected return to work date on January 26, 2015. The letter stated that there were 264 hours of FMLA leave remaining.

161. A post-it note from Specialist Dotson was attached to the letter stating that Beal ran out of paid leave on December 31, 2014.

162. On or about January 13, 2015, Defendant called Beal's health care provider and clarified that Beal could return to work on full-duty with no restrictions beginning January 26, 2015.

163. On or about January 18, 2015, Beal received paperwork related to applying for STD.

164. On or about January 26, 2015, Beal had a follow up appointment with Dr. Richardson. Dr. Richardson completed Beal's STD paperwork, which estimated that he would be able to return to work on March 1, 2015. Dr. Richardson also told Beal that he would write him out of work until March 1, 2015. However, the out-of-work note that Beal received from Dr. Richardson excused him from work from January 26, 2015 through March 16, 2015.

165. On or about January 27, 2015, Beal provided Specialist Stone with a copy of his STD paperwork and his out-of-work note dated January 26, 2015.

166. Beal specifically told Specialist Stone that Dr. Richardson had put him out of work until March 1, 2015.

167.   Specialist Stone appeared noticeably agitated, and she told Beal that he was going to have to complete more paperwork.

168.   Beal told Specialist Stone to give him any additional paperwork that he needed to complete.

169.   On or about January 28, 2015, Specialist Dotson called Beal's health care provider and spoke with Pam (LNU).

170.   Pam informed Specialist Dotson that Dr. Richardson felt like Beal needed to be out of work until March 1, 2015.

171.   After receiving Beal's request for additional leave until March 1, 2015, Defendant did not make any efforts to communicate with Beal or assist him in seeking an accommodation.

172.   Defendant never provided Beal with any additional paperwork to complete.

173.   Defendant never contacted Beal to discuss his medical status, his anticipated return to work date, or his intent to return to work.

174.   Defendant never requested that Beal return to work earlier than March 1, 2015.

175.   Defendant never requested that Beal provide a definitive return-to-work date.

176.   Defendant never notified Beal that he was a key employee or that he held an essential/critical position.

177.   Defendant never notified Beal of the potential consequence that his employment may be terminated if he was unable to return to work on the date that his

FMLA leave expired.

178.     Defendant never notified Beal of the date that his FMLA leave was going to expire.

179.     Beal was not aware of the date that his FMLA leave was going to expire.

180.     On information and belief, Beal's FMLA leave expired on or about February 4, 2015.

181.     By letter dated February 4, 2015, Defendant provided Beal with notice that his employment was terminated. The letter stated, in pertinent part:  "This letter is to inform you that your probationary appointment as a Health Care Technician I, will end on February 4, 2015."

182.     Plaintiff's employment by Defendant was terminated on or about February 4, 2015.

183.     Prior to Beal's termination, he was never given notice of the date that his FMLA leave was going to expire, that his FMLA leave had been exhausted, that his employment may be terminated, that he could not remain on leave until March 1, 2014, or that Defendant would not hold his job while he remained on leave until March 1, 2014.

184.     On or about February 11, 2015, Beal called Specialist Stone to discuss the termination of his employment.

185.     During this conversation, Beal asked Specialist Stone why he was terminated.

186.     During this conversation, Specialist Stone advised Beal that he was terminated because he was still in the probationary period and he was in a critical position.

187.    During this conversation, Beal advised Specialist Stone that he did not want to lose his job.

188.    During this conversation, Beal asked Specialist Stone if he could be rehired.

189.    During this conversation, Specialist Stone advised Beal that he could not be rehired for a period of time following his termination.

190.    Defendant refused to rehire Beal following the termination of his employment.

191.    Defendant refused to accommodate Beal's reasonable request for extension of leave until he was released to return to work on March 1, 2014.

192.    Defendant's policies and regulations provide that employees may be granted additional sick leave without pay up to one year after the initial 12 weeks of FMLA leave has been exhausted.

193.    On information and belief, Defendant has allowed employees in HCT I positions to receive additional leave without pay after FMLA leave has been exhausted.

194.    On information and belief, Defendant has hired temporary employees to work in HCT I positions to fill in for permanent employees on leave.

195.    On information and belief, Defendant has hired temporary employees to work in HCT I positions for both short and extended periods of time.

196.    Beal was not offered or given any additional sick leave after his FMLA leave was exhausted.

197.    Defendant did not hire an employee to replace Beal until after March 1, 2015.

198.     On or about February 10, 2015, Defendant posted a Health Care Technician I (HCT I) position on the second shift with the R3 Unit, with a closing date of February 16, 2015.

199.     On or about March 18, 2015, Melissa Wolfe was hired to take Beal's HCT I position on the second shift with the R2 Unit.

200.     On information and belief, Melissa Wolfe has no known disability.

201.     In 2016, Beal was diagnosed with Post Traumatic Stress Disorder with panic attacks.

202.     Beal 's PTSD substantially limits one or more of his major life activities and major bodily functions, including, but not limited to, thinking, concentrating, interacting with others, and communicating.

203.     At the time of Beal's termination, he would have been able to perform the essential functions of his position with a reasonable accommodation, and was a "qualified individual with a disability" as defined in the ADA.

204.     Defendant had notice of Beal's disability and his history of disability.

205.     Despite knowing of Beal's disability, Defendant refused to reasonably accommodate Beal's disability, including, but not limited to granting Beal's requests to leave work during a panic attack, to transfer to an open position, to receive additional leave for necessary medical treatment, to hold his position for him during his additional leave, and to be rehired following his termination.

206.     The reasonable accommodations Beal requested would not have imposed an undue hardship on Defendant.

207.     Beal was terminated from his job because of his disability, his history of

disability, and Defendant regarding him as a person with a disability; because of his request and need for accommodations for his disability; and in retaliation for requesting reasonable accommodations.

208.    As a result of being terminated from his job, Beal lost wages and benefits of employment.

209.    As a result of being terminated from his job, Beal was unable to receive necessary medical treatment.

210.    As a direct and proximate result of the actions of Defendants set forth herein, Beal has suffered pecuniary and non-pecuniary harm, including lost and continued loss of compensation and fringe benefits, embarrassment, humiliation, inconvenience, mental suffering, emotional distress, medical expenses, damage to his reputation, and loss of enjoyment of life.

## FIRST CAUSE OF ACTION:
## ADA DISABILITY DISCRIMINATION

211.    Plaintiff hereby incorporates by reference the allegations of paragraphs 1 through 210 in support of this claim for relief.

212.    The actions of Defendant, as set forth herein, constitute intentional discrimination against Plaintiff on the basis of his disability, his history of disability, and Defendant's belief that he had a disability in violation of the ADA.

213.    Without limitation, Defendant's discriminatory practices included failing to make a good faith effort to assist Beal in seeking accommodations for his disability.

214.    Without limitation, Defendant's discriminatory practices included failing to provide Plaintiff with reasonable accommodations for his disability.

215.    Without limitation, Defendant's discriminatory practices included

23

unlawfully terminating Plaintiff's employment.

216.    Without limitation, Defendant's discriminatory practices included refusing to rehire Plaintiff after his employment was unlawfully terminated.

217.    Plaintiff is entitled to all of his benefits of employment, including, but not limited to, back pay, front pay, and health insurance, as a proximate result of Defendant's conduct alleged herein.

218.    Plaintiff is entitled to recover compensatory damages as provided by the ADA as a proximate result of Defendant's conduct alleged herein.

219.    Plaintiff is further entitled to recover reasonable attorneys' fees, the costs and the expenses of this action, and such interest as may be allowed by law.

**SECOND CAUSE OF ACTION:**
**ADA RETALIATION**

220.    Plaintiff hereby incorporates by reference the allegations of paragraphs 1 through 210 in support of this claim for relief.

221.    The actions of Defendant, as set forth herein, constitute retaliation against Plaintiff, in violation of the ADA.

222.    Without limitation, Defendant's retaliation against Plaintiff included unlawfully terminating Plaintiff after his request for a reasonable accommodation for his disability.

223.    Without limitation, Defendant's discriminatory practices included refusing to rehire Plaintiff after his employment was unlawfully terminated.

224.    Plaintiff is entitled to all of his benefits of employment, including, but not limited to, back pay, front pay, and health insurance, as a proximate result of Defendant's conduct alleged herein.

225.    Plaintiff is entitled to recover compensatory damages as provided by the ADA as a proximate result of Defendant's conduct alleged herein.

226.    Plaintiff is further entitled to recover reasonable attorneys' fees, the costs and the expenses of this action, and such interest as may be allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    That all issues of fact raised by this pleading be tried by a jury;

2.    That the Court declare that the acts and practices complained of herein were illegal and prohibit Defendant from engaging in such action in the future;

3.    That an injunction be issued reinstating Plaintiff to his position, together with appropriate wage increases and benefits;

4.    Actual and compensatory damages under the ADA;

5.    Reasonable attorney's fees pursuant to federal law;

6.    The costs incurred by Plaintiff in connection with this action;

7.    Such interest as may be allowed by law; and

8.    Such other and further relief as may be just, proper, and necessary to afford complete relief to Plaintiff.

Respectfully submitted this the 21st day of April, 2017.

/s/ Jessica E. Leaven
Jessica E. Leaven (NC Bar # 27832)
GRIMES TEICH ANDERSON LLP
535 College Street
Asheville, NC 28801
Telephone: (828) 251-0800
Facsimile: (828) 236-9200
Email: leaven@gtalaw.net
Attorney for Plaintiff

25